UNITED STATES BANKRUPTCY COURT

MIDDLE DISTRICT OF LOUISIANA

IN RE:

**COSSETTA DARA WARD**
**DERRICK WARD**
    DEBTORS

**BATON ROUGE NEONATAL ASSOCIATES**
    PLAINTIFF

VERSUS

**COSSETTA DARA WARD**
**DERRICK WARD**
    DEFENDANTS

CASE NO.
**01-13035**

CHAPTER 7

ADV. NUMBER
**02-1054**

**MEMORANDUM OPINION**

Plaintiff Baton Rouge Neonatal Associates ("BRNA"), sued the debtors, Cossetta and Derrick Ward, for a denial of their discharge or alternatively to have their debt to BRNA declared nondischargeable. The Court denies the debtors' discharge pursuant to 11 U.S.C. §§727(a)(2) and (5), and further holds that Mrs. Ward's debt to BRNA is nondischargeable under 11 U.S.C. §523(a)(6).

**FACTS**

This lawsuit arises out of BRNA's treatment of the debtors' twins, Truth and Justice Ward, who were born prematurely at Woman's Hospital on May 31, 2000. The parties stipulated that BRNA, a group of neonatologists who cared for the children, is owed $118,345 for treating the infants.[1] The debtors

---

[1] In October 2001, the state court rendered judgments in favor of BRNA and against Mr. and Mrs. Ward for $118,375, plus interest and costs. The judgments were attached to BRNA's

filed a chapter 7 petition on November 29, 2001. BRNA sued the debtors on May 10, 2002 to have the debt to BRNA declared nondischargeable, or in the alternative to bar the debtors' discharge.

Mrs. Ward, who was not living with her husband when the children were born, signed a patient registration form in connection with her May 24, 2000, admission to Woman's Hospital for the delivery. The form included assignments of benefits from the debtors' hospital insurance carrier, Blue Cross/Blue Shield ("Blue Cross"), to both the hospital and hospital-based physician groups, including neonatologists.[2] Because the hospital was not a Blue Cross network provider, Blue Cross did not recognize the assignment of benefits.[3] As a result, the carrier did not pay BRNA directly for its treatment of the twins. Instead, Blue Cross issued checks payable to Derrick Ward for a total of $106,037.53. The Wards admit receiving Blue Cross checks totaling $106,037.53, and not paying any of the Blue Cross money to BRNA.

## LAW

### I. The Debtors Have Failed to Explain Satisfactorily the Deficiency of Assets to Meet their Liabilities.

Bankruptcy Code section 727(a)(5) provides that a bankruptcy court may deny discharge to a debtor who has failed to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liability. 11 U.S.C. §727(a)(5). BRNA as the plaintiff had the initial burden of proving the objection to discharge. Fed. R. Bank. P. 4005. Once it pointed out the debtors' receipt and apparent inability to

---

(footnote continued from prior page)
proof of claim, which was admitted into evidence as Exhibit 1.

[2] The form also included an acknowledgment of personal liability for hospital charges as well as a guaranty of payment.

[3] Dr. Steven Spedale, president of BRNA, testified that Blue Cross did not act on the assignment because BRNA had declined to sign a provider agreement with Blue Cross.

account for the funds received from Blue Cross, the burden shifted to the debtors to satisfactorily explain what happened to those funds. *In re Chalik,* 748 F.2d 616, 619 (11th Cir. 1984), citing *In re Reed,* 700 F.2d 986, 992-993 (5th Cir. 1983). The Fifth Circuit observed in *Reed* that in an action under 11 U.S.C. §727(a)(5), after the creditor makes a prima facie case, the debtor must provide a satisfactory explanation of the loss of his assets. 700 F.2d at 992.

For a debtor's explanation regarding missing assets to be adequate, it must eliminate the Court's need to speculate about the disposition of the assets. It also must be corroborated. *Matter of D'Agnese,* 86 F.3d 732, 734 (7th Cir. 1996) (upholding bankruptcy court's denial of discharge under §727(a)(5) where debtor offered only vague and indefinite statements about disposition of missing assets with substantial value, and failed to corroborate alleged transfers). Thus, the Wards were required to produce direct, specific evidence regarding the disposition of the Blue Cross money in order to defeat BRNA's objection. *In re Ridley,* 115 B.R. 731, 737 (Bankr. D. Mass. 1990), citing *McBee v. Sliman,* 512 F.2d 5054 (5th Cir. 1975). *See also In re Dolin,* 799 F.2d 251 (6th Cir. 1986) (affirming denial of discharge under §727(a)(5) for lack of satisfactory explanation of loss of assets by debtor who claimed that he spent money supporting cocaine habit and compulsive gambling); *In re Clark,* 211 B.R. 105 (Bankr. M.D. Fla. 1997) (vague and uncorroborated assertions that debtor spent money on living expenses or lost it through gambling are not satisfactory under 11 U.S.C. §727(a)(5)); *In re Carter,* 274 B.R. 481 (Bankr. S.D. Ohio 2002) (denying discharge to debtor who claimed without corroboration to have lost substantial sum gambling).

The debtors have not satisfactorily explained the disposition of the proceeds of the Blue Cross checks. Both debtors testified that at one time or another, each used part of the Blue Cross funds for

3

purposes other than paying their children's medical bills. Mr. Ward, who initially received and cashed the checks, offered inconsistent testimony on direct examination with regard to his living expenses. After first stating that he was unable to say what portion of the Blue Cross money he spent on living expenses because he was "always partying," he later estimated that probably half of the funds were used for his living expenses.[4] Mr. Ward also admitted on cross-examination that he used the funds to pay living expenses, purchase controlled substances, outfit his truck[5] and to "party."[6] He also acknowledged that he no longer had any of the money, and had no receipts or documents to show what happened to at least $44,000 of it.

Mrs. Ward testified that once she started receiving the checks, she used the Blue Cross money to buy diapers and other baby supplies and to pay living expenses, including child care, because her husband was not supporting her and she was not working outside the home.[7] Like her husband, she produced no receipts for the expenditures.

Once BRNA produced evidence showing the debtors' receipt of the Blue Cross funds, the debtors had the burden of satisfactorily explaining what happened to the money. The debtors' vague, uncorroborated explanations of the debtors' disposition of the substantial amount of money derived from

---

[4] Mr. Ward admitted that he was not giving his wife any money at that time.

[5] The enhancements included rims costing between $3000 and $4000, bumper guards, a television, and DVD and videocassette players.

[6] Mr. Ward's "partying" was facilitated by controlled substances he bought with the Blue Cross funds.

[7] Mrs. Ward worked for First USA Bank before the twins were born. She testified that after their birth, once her medical leave was exhausted, she was living on only $30 she received per child each month. She did not identify the source of those funds.

4

the Blue Cross payments are inadequate to satisfy the Court concerning the missing funds. For that reason, the Court will deny their discharge pursuant to 11 U.S.C. §727(a)(5).

### II. Mrs. Ward's Sale of the Lexus Was Made to Hinder, Delay or Defraud Creditors

Bankruptcy Code section 727(a)(2) directs the Court to deny a discharge to any debtor who,

> with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed - (A) property of the debtor, within one year before the date of the filing of the petition; or (B) property of the estate, after the date of the filing of the petition....

11 U.S.C. §727(a)(2).

Proof of actual intent is essential in an action under section 727(a)(2), but because a debtor is unlikely to testify directly to his fraudulent intent, actual intent may be inferred from the debtor's actions. *Matter of Chastant*, 873 F.2d 89, 91 (5th Cir. 1989) (citations omitted); *In re Gollomp*, 198 B.R. 433 (Bankr. S.D.N.Y. 1996) (court may infer actual intent to defraud from evidence of inadequacy of consideration; relationship between parties; retention of benefit of property in question; financial condition of party before and after transfer; onset of financial difficulties or pendency of lawsuit by creditors); and *In re Schmit,* 71 B.R. 587 (Bankr. D. Minn. 1987) (factors from which actual intent to defraud may be inferred include among others inadequacy of consideration; debtor's family, friendship or close associate relationship with the transferee; debtor's retention of possession, benefit or use of the property; and debtor's financial condition at the time of the transfer).

Mrs. Ward testified that she bought a 1992 Lexus LS400 for $10,500 after the children's birth. The vehicle replaced a two-door sports car she had owned. Mrs. Ward opened a Hancock Bank account

5

titled "For the Benefit of Truth and Justice Ward" on November 7, 2000, and used funds from that account to buy the 1992 Lexus LS400 for $10,500. She admitted on cross-examination that about one year later, she sold the car for $1500 to Jeffrey Johnson, her former brother-in-law. Thus, Mrs. Ward's sale of the car must have fallen within a year before the November 29, 2001 bankruptcy filing, although it was not disclosed on the Statement of Financial Affairs filed on the Wards' behalf. She suggested that the automobile needed some repairs (specifically, replacement of struts and a window switch, and unspecified work on the transmission) but admitted that she had not obtained any estimates for the cost of the work. On cross-examination, Mrs. Ward admitted that her former brother-in-law allows her to use the car whenever she wants.

The plaintiff has offered ample evidence from which the Court can infer Mrs. Ward's actual intent to defraud her creditors in connection with the transfer of the Lexus to her former brother-in-law. Accordingly, the Court finds that Mrs. Ward's discharge also should be denied pursuant to 11 U.S.C. §727(a)(2).

### III. Mrs. Ward's Use of Previously Assigned Funds is a Nondischargeable Conversion

Having disposed of the debtors' entitlement to a discharge, the Court need not reach the issue of dischargeability. However, considering that BRNA has proven its case against Mrs. Ward under 11 U.S.C. §523(a)(6), the Court will address that claim.

When Mrs. Ward was admitted to Woman's Hospital on May 24, 2000, she signed a patient registration form that contained two assignments of hospital insurance benefits. The first, on the face of the form, was captioned "Assignment of Insurance Benefits," and assigned any and all hospital or medical

6

benefits to Woman's Hospital and its hospital-based physicians. The second assignment appeared on the rear of the form, and was captioned "Assignment of Insurance Benefits to Physicians." It specifically assigned any insurance benefits due for services to the treating physicians who rendered the services, including neonatologists. Both provisions authorized payment of any insurance benefits directly to the hospital or the doctors.

Mrs. Ward testified that she did not know why Blue Cross was sending checks to her and her husband. Her testimony on this point is not credible, and also conflicts with the evidence. Mrs. Ward received statements for services from the physicians. She also admitted learning from a doctor and a staff member at one of her children's doctors' offices that Blue Cross had begun making payments for the twins' treatment. The staff member asked Mrs. Ward to check with Blue Cross to learn where the payments had gone, because the physician had not been receiving them.[8] Accordingly, by the time of those communications, which took place before she received any of the funds, Mrs. Ward certainly knew that the Blue Cross checks were intended to pay the treating physicians. Her testimony to the contrary is simply not credible.

The assignments vested title in the transferees, including BRNA, who received the "present and immediate right" to the Blue Cross benefits. *Mahayna, Inc. v. Poydras Center Associates, Inc.*, 96-2089 (La. App. 4th Cir. 4/30/97), 693 So.2d 355, 357. For that reason, Mrs. Ward's use of the Blue Cross funds for purposes other than paying the treating physicians or Woman's Hospital was a conversion under Louisiana law. *Dual Drilling Co. v. Mills Equipment Investments, Inc.*, 98-0343, 98-0356 (La.

---

[8] Mrs. Ward learned that Blue Cross had in fact mailed checks to her husband, who was living in Mississippi. She then directed Blue Cross to mail all future payments to her home.

12/1/98), 721 So.2d 853, 857 (citations omitted) (conversion includes withholding possession from rightful owner and misuse of property); *Ducote v. City of Alexandria*, 95-1269 (La. App. 3d Cir. 7/17/96), 677 So.2d 1118, 1122 (any wrongful exercise or assumption of authority over another's goods is a conversion, even if defendant did not engage in conscious wrongdoing) (citations omitted).

The record supports the conclusion that Mrs. Ward's conversion of the Blue Cross payments was done deliberately, intentionally and without justification or excuse. She spent the funds because she had minimal personal income and no savings.[9] Moreover, Mrs. Ward testified that she was not working and had no means of support when the children were born. The facts support the inference that Mrs. Ward used the money with the knowledge that she would not be able to repay Blue Cross, which therefore was substantially certain to suffer a loss as a result of her actions. *Matter of Miller,* 156 F.3d 598, 606 (5th Cir. 1998) (injury is willful or malicious under §523(a)(6) where there is either an objective substantial certainty of harm or a subjective motive to cause harm). Her actions therefore were willful and malicious within the meaning of section 523(a)(6), and as a result her obligation to Blue Cross is nondischargeable. *See In re Hazelwood*, 43 B.R. 208, 213 (Bankr. E.D. Va. 1984) (conversion of medical benefits after debtor's revocation of assignment of benefits to hospital) (citations omitted).

For these reasons, Mrs. Ward's debt to BRNA will be held nondischargeable under section 523(a)(6) of the Bankruptcy Code.

### IV. Other Relief Sought by BRNA

BRNA's complaint also sought relief under 11 U.S.C. §§523(a)(2)(A), (a)(4), and 727(a)(4). The

---

[9] See footnote 7, above.

Court now addresses each of those claims.

The evidence did not support a finding that the debtors received BRNA's services through false pretenses, a false representation or actual fraud, or that either debtor did not intend to use the insurance benefits to pay BRNA when Mrs. Ward was admitted to Woman's Hospital. Accordingly, BRNA offered insufficient evidence to support its claims that the Wards engaged in any conduct within the scope of Bankruptcy Code §523(a)(2)(A).

The plaintiff's claim under §523(a)(4) was dismissed pursuant to Fed. R. Bankr. P. 7052 at the conclusion of its case in chief for reasons rendered orally at that time.

Finally, BRNA's complaint alleged in paragraph 1 that it had a claim under §727(a)(4).[10] However, the section is not mentioned elsewhere in the complaint, and in any case, the plaintiff did not prove that either debtor engaged in any conduct within the scope of that subsection of section 727.

---

[10] Bankruptcy Code section 727(a)(4) provides: "The court shall grant the debtor a discharge, unless –

\* \* \*

(4) the debtor knowingly and fraudulently, in or in connection with the case — (A) made a false oath or account; (B) presented or used a false claim; (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs. . . ."

## CONCLUSION

The Court will enter a judgment in conformity with this Memorandum Opinion.

Baton Rouge, Louisiana, January 23, 2003.

**s/ Douglas D. Dodd**
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE